# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00081-CR

**Brenda Ann Johnson a/k/a Brenda Ann McDonald, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT NO. 03-727-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## O P I N I O N

Appellant Brenda McDonald appeals her jury conviction for assault on a public servant, *see* Tex. Pen. Code Ann. § 22.01(b)(1) (West Supp. 2004-05), for which the jury assessed punishment at two years' imprisonment, which was probated, and imposed a fine. Appellant filed a motion for new trial, asserting that she received ineffective assistance of counsel. After a hearing, the court overruled the motion.

Appellant now challenges the legal and factual sufficiency of the evidence to support her conviction, and she further contends that her trial counsel rendered ineffective assistance of counsel. We hold that the evidence was legally and factually sufficient. Because trial counsel's performance fell below an objective standard of reasonableness, however, and there is a reasonable probability that, but for counsel's errors, the result of the case would have been different, and this case presents that "rare" case in which the record is sufficient for us to make a decision on the

merits,[1] we reverse the judgment on the ground that appellant received ineffective assistance of counsel and remand for a new trial.

## FACTS AND PROCEDURAL BACKGROUND

Four police officers, a paramedic, appellant's husband, three defense witnesses, and appellant testified at a trial that spanned two days. The testimony revealed that on the early afternoon of February 9, 2002, officers with the Georgetown Police Department responded to a 911 call from appellant's husband, John Dickerson, stating that he and his wife had been in a fight and that she needed an ambulance. When appellant told her husband that she did not need an ambulance, he placed a second call to advise the department that "everything was fine." Georgetown police officers Bert Witcher, Amy Beckwith, and Sheryl Self arrived at appellant's apartment and knocked on the front door, identifying themselves as police officers and demanding that the occupants open the door. When no one responded, the officers requested the dispatcher to call the residence. Although they could hear the telephone ring inside the apartment, no one answered the door. Because the officers were concerned that someone might be injured, they forced their way into the apartment. Witcher testified at trial that he kicked the door down.

Upon entry, the officers located appellant and her husband in a bedroom. At trial, Beckwith testified that the officers observed Dickerson sitting on the bed with his back to the door and appellant lying in the bed under the covers. Appellant advised the officers that everything was all right and that they should leave. Seeking to interview the two individuals separately, Witcher instructed Dickerson to get up and go with him to another room. At trial, Witcher could not recall

---

[1] *See Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

whether Dickerson responded. Self testified that Dickerson did not respond but that appellant became agitated and told Dickerson not to talk to the police, that the officers had no right to be in the apartment, and that he had a right not to talk to the police. Witcher grabbed Dickerson and escorted him from the room. Before leaving the room, Witcher gestured to the other officers to "handle" appellant.

As Witcher led Dickerson away from the bedroom, an altercation ensued between appellant and the other two officers. At trial, appellant testified that, as she attempted to remove the bedcovers with her legs, the two officers "jumped" on her without warning or explanation; the two officers testified that appellant "lunged" at them as she arose up out of the bed. Appellant acknowledged that she unintentionally kicked the officers as she tried to kick off the bedcovers. Beckwith testified that appellant, who was dressed only in a bra and panties, sat straight up as though she was going to try to get up out of bed to follow her husband. The officers "moved in." Self testified that she and Beckwith tried to keep appellant on the bed by pressing her upper body back down on the bed. Beckwith testified that she and Self attempted to restrain appellant by grabbing her arms. As the officers grabbed her arms, appellant began flailing her arms and kicking her legs at them.

Both officers testified that they were injured by appellant. Beckwith testified that appellant kicked her in the stomach, chest, and chin, causing her chin to "sting" and become swollen and red. Her eyeglasses and her pager were knocked to the ground. Appellant kicked Self in the chin and chest. As the officers backed away from appellant to "de-escalate" the situation, appellant charged toward the bedroom door. As Self sought to block appellant's exit from the room, appellant attempted to force her way out. Self's head hit the doorway, and she received a contusion on the side

3

of her head. Appellant was able to exit the room despite an attempt by both officers to restrain her. In the next room, appellant placed a call to her pastor for help.

Meanwhile, Witcher led Dickerson away from the altercation. He placed Dickerson, who was not under arrest, in handcuffs in the back of a patrol car. Witcher then returned to the apartment to assist the other officers.

At that moment, Officer Dale Duncan arrived at the scene. Duncan testified that he observed appellant crouched in the corner of a room: "She was highly agitated. She was yelling, crying. She didn't have very much clothes on." Although Duncan did not "know what we had," he was familiar with appellant and "I could see that there was no immediate threat to myself." He thought appellant recognized him and he attempted to calm and reassure her. Duncan was wearing a police microphone that was active and made an audio recording of the events transpiring after his arrival.[2] Approximately forty minutes later, appellant was placed under arrest and transported to the police station.

Appellant was charged with two counts of assaulting a public servant. After deliberating for four hours, the jury returned a verdict of guilty on both counts and, after the sentencing phase, recommended that appellant be placed on probation.

Appellant filed a motion for a new trial, asserting that she had received ineffective assistance of counsel. Appellant claimed, *inter alia*, that trial counsel had failed to obtain and object

---

[2] Throughout the proceedings, the tape is variously referred to as a video or audio tape. Although the tape has a video capability, the video is mounted on the police car and showed only the exterior of the apartment complex. A microphone on Duncan's person captured the audio version of the events inside the apartment. The recording is hereinafter referred to as an "audiotape."

to the admission and incomplete presentation of Officer Duncan's audiotape of the arrest. With respect to the audiotape, appellant averred in her affidavit:

> An audio tape was introduced at trial that was recorded without my knowledge during my arrest. I was never informed that such a recording existed prior to the beginning of trial, I was given no opportunity to hear this tape. It is my understanding from speaking to my trial attorney that he was unaware of this tape until the start of trial. A discovery motion was filed early on in my case which I believe, although I personally have not read the motion, contained requests for production of audio tapes prior to the start of trial. In addition, upon hearing the tape played during trial it is my belief that the tape was incomplete. I recall additional statements being made after the tape was turned off at trial. I believe those statements to be material to this case. My attorney was not prepared for this and failed to object to the introduction of the tape as well as failing to object to the incomplete nature of the tape.

Both appellant and her trial counsel testified at the motion for new trial. At the close of the hearing, the district court denied the motion for new trial.

## ANALYSIS

In three issues on appeal, appellant challenges the legal and factual sufficiency of the evidence to support her convictions and further contends that she received ineffective assistance of counsel.

### I.    *Sufficiency of the Evidence*

In a legal sufficiency challenge, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). In a factual sufficiency challenge,

5

we view the evidence in a neutral light, not favoring either side, and determine whether the fact-finder was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). Evidence may be found factually insufficient when the evidence supporting the verdict, when considered alone, is too weak to support the finding of guilt beyond a reasonable doubt, or the evidence contrary to the verdict is so strong that the standard of beyond a reasonable doubt could not have been met. *Id.* at 484-85.

A person commits assault if the person intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Pen. Code Ann. § 22.01(a)(1) (West Supp. 2004-05). The offense is a third degree felony if the offense is committed against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty. *Id*. § 22.01(b)(1). The indictment alleges that appellant did intentionally, knowingly, or recklessly cause bodily injury to the officers while they were lawfully discharging an official duty. Assault on a public servant, as alleged in this case, requires proof of misdemeanor assault under section 22.01(a)(1), plus proof of these additional elements: the person assaulted was a public servant; the actor knew that the person he assaulted was a public servant; and the person assaulted was lawfully discharging official duties at the time of the assault. *Id.* § 22.01(b)(1).

Appellant challenges the legal sufficiency of proof only as to the element of whether the officers were "lawfully discharging" their duties when they placed their hands on appellant to restrain her. Appellant asserts that she repeatedly told the officers that she was not in need of assistance, that she asked them to leave her home, and that they had no reason to lay their hands on her at any point. She contends that neither she nor her husband did anything to provoke the officers.

6

For these reasons, appellant argues that the officers stepped outside the lawful discharge of their duties.

An officer is acting within the lawful discharge of his official duties "as long as the officer [is] acting within his capacity as a peace officer." *Guerra v. State*, 771 S.W.2d 453, 461 (Tex. Crim. App. 1988); *see also Hall v. State*, 158 S.W.3d 470, 474 (Tex. Crim. App. 2005). In determining whether an officer is acting within his capacity as a peace officer, we look to the details of the encounter, such as whether the police officer was in uniform, on duty, and whether he was on regular patrol at the time of the assault. *Hughes v. State*, 897 S.W.2d 285, 298 (Tex. Crim. App. 1994). The "lawful discharge" of official duties means that the law enforcement officer is not criminally or tortiously abusing his office as a public servant. *Hall*, 158 S.W.3d at 474-75.

Appellant does not dispute that the officers were on duty and in uniform, responding to a 911 telephone call made by her husband. Although she argues that the officers were not justified in remaining on the premises to investigate the call, the evidence is ample that the officers were following up on the call from their dispatch operator and sought to interview appellant and her husband to determine if further action was warranted. Each of the officers testified that it was standard police procedure, when responding to a domestic disturbance, to separate the parties and interview them separately. Before removing Dickerson from the bedroom, Witcher signaled to Self to contain appellant inside the room so that she would not interfere with his interview of Dickerson. Beckwith and Self both testified that it was at that point that appellant attempted to rise from the bed as if to follow Dickerson. Beckwith and Self testified that they attempted to restrain appellant to isolate her from her husband to interview her separately. A jury could have rationally concluded that

7

the attempt by Self and Beckwith to restrain appellant on the bed was a lawful exercise of a police duty. We overrule appellant's second point of error.

Appellant also argues that the evidence is factually insufficient to prove that she intentionally, knowingly, or recklessly caused bodily injury to either Self or Beckwith. Appellant contends that she has a long history of medical problems that were aggravated by the officers as they attempted to restrain her. At trial, appellant testified that she is partially disabled due to rheumatoid arthritis and that the officers' actions caused her pain and discomfort. She testified that she told them to get off of her and that they were hurting her. Although she struck the officers as she attempted to remove the comforter, the contact was not intentional. Because the officers were attempting to restrain her arms and were causing her pain, she could only use her legs to remove the covers. Appellant contends that the officers' attempt at restraint scared her and that she was trying to defend herself so she could call for help. When she freed herself from the officers' restraint, she ran into an adjoining room and called her pastor.

As the arbiter of witness credibility, the jury was entitled to believe the testimony of Beckwith, Self, and Witcher over appellant's account of the events that transpired. *See Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). There was no evidence challenging the testimony of the officers that the task of separating persons involved in a domestic disturbance, and keeping them separate, is an official duty of law enforcement and an appropriate response to these circumstances. Both Beckwith and Self testified that they did not attempt to restrain appellant until she lunged from the bed toward the bedroom door. Based on appellant's agitated emotional state, the removal of Dickerson from the room, appellant's attempt to rise from the bed and leave the room,

8

and the officers' attempt to restrain her, a jury could find that appellant acted at least with the requisite culpable mental state of recklessness. The jury resolved any conflict in the testimony in favor of the officers. Appellant's first point of error is overruled.

## II.   *Ineffective Assistance of Counsel*

In her third issue on appeal, appellant contends that her trial counsel rendered ineffective assistance of counsel because, *inter alia*, he failed to conduct sufficient discovery to learn that there was an audiotape of the incident that is the basis of the offense. And, upon learning mid-trial of the audiotape's existence, trial counsel ignored appellant's request to review the tape, agreed to admit an incomplete version of the tape, and failed to seek admission of the only portion of the tape that was arguably exculpatory. Significantly, trial counsel failed to object to questions by the prosecutor and responses by the State's witnesses suggesting that the only portion of the tape that was redacted was "surplusage" footage, irrelevant to this incident. The State responds that appellant has failed to demonstrate how trial counsel's failure to review the recording prior to trial constituted a deficiency and that, in any event, appellant was not prejudiced by any error. Because of (i) the failure of trial counsel to seek and obtain meaningful discovery in this case, (ii) the manifold issues raised by the tape's late production to counsel without appellant having the benefit of hearing the tape prior to its admission at trial, and (iii) the incomplete and misleading manner in which the tape was introduced into evidence without objection, we agree with appellant that trial counsel's performance was deficient and that the deficiency prejudiced her.

For claims of ineffective assistance of counsel, the standard of review is set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Hernandez v. State*, 726 S.W.2d 53 (Tex.

9

Crim. App. 1986) (adopting *Strickland* as the applicable standard in Texas). To prevail on a claim of ineffective assistance, an appellant must, by a preponderance of the evidence, prove both that trial counsel's performance fell below an objective standard of reasonableness and that counsel's deficient representation prejudiced appellant's defense, resulting in a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688; *Johnson v. State*, No. PD-1623-03, 2005 Tex. Crim. App. LEXIS 818, at *16 (Tex. Crim. App. May 25, 2005); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). In other words, appellant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686. If, however, "there is at least the possibility that the conduct could have been legitimate trial strategy," then we must "defer to counsel's decision and deny relief on an ineffective assistance claim on direct appeal." *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003). A *Strickland* claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We indulge a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance. *Id.*

*Strickland* also speaks to a claim that counsel inadequately investigated the case. Under *Strickland*, an attorney has the duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. We consider an attorney's decision not to investigate, or to limit the scope of investigation, with a great deal of deference to the attorney's judgment, looking to the reasonableness of the decision in light

10

of the totality of the circumstances. *Id*. We will sustain a challenge to the sufficiency of counsel when a lack of investigation fails to advance the accused's only viable defense, and there is a reasonable probability that, but for counsel's failure to advance the defense, the result of the proceeding would have been different. *Id*.; *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996). "Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland*, 466 U.S. 685. Further, it is possible that a single egregious error of omission or commission by appellant's counsel may constitute ineffective assistance. *Thompson*, 9 S.W.3d at 813.

Although we rarely entertain ineffective assistance of counsel claims on direct appeal because of an inadequate record, instead relying on collateral proceedings for such challenges, this case fits within an exception to the rule. Here, the facts were sufficiently developed in the record on the motion for new trial and trial counsel was afforded the opportunity to explain any strategy decisions. This fully developed record thus warrants direct appellate review. *Compare*, *e.g.*, *Goodspeed v. State*, No. PD-1882-03, 2005 Tex. Crim. App. LEXIS 520, at *10 (Tex. Crim. App. April 6, 2005) (holding that record was insufficiently developed for appellate review when no hearing was held on motion for new trial and motion did not discuss conduct under scrutiny) *with Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005) (holding that record was sufficiently developed for appellate review, although record did not reflect trial counsel's subjective reasoning, when no reasonable trial strategy could justify counsel's conduct)*.* We hold, therefore, that this is the "rare case" in which the record on direct appeal is sufficient to demonstrate that counsel's performance was deficient. *See Andrews*, 159 S.W.3d at 103; *Robinson v. State*, 16 S.W.3d 808, 813

11

n.7 (Tex. Crim. App. 2000). We review the procedural history relevant to the motion for new trial and appellant's third point of error.

### A. Procedural History

#### 1. Pre-trial proceedings

In a January 16, 2003 pre-trial hearing, the district court noted that appellant's trial counsel had adopted pre-trial motions filed by prior counsel on December 12, 2002. The court noted motions for notice under "404(b), 609(f), 37.07" and stated, "All that remains is for the Court to indicate those should be given 10 days prior to trial." Among the discovery items requested were all statements made by the defendant. Specifically, the motion included a request for "[a]ll oral confessions, admissions and statements, made by the Defendant to the state in connection with this case, which have been electronically recorded." In response to an inquiry from the court as to whether any motions for discovery "require[d] the Court's attention," appellant's trial counsel responded, "Not at this time, Your Honor." Although the docket sheet indicates that motions were heard, there is no indication that defense counsel sought an order and no order appears in the record. The court granted appellant's Motion for Discovery of Exculpatory and Mitigating Evidence pursuant to *Brady v. Maryland*; the record does not reflect that any evidence was produced pursuant to the motion. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

On June 10, 2003, appellant's trial counsel filed a motion for continuance of the trial scheduled for June 16. The trial was rescheduled for December 1. On November 21, the State filed its witness list and supplemental witness list containing the names of eighteen witnesses.

12

## 2. *Trial*

After three officers had testified and the lunch recess was approaching, the prosecutor asked for permission to approach the bench. Out of the hearing of the jury, he advised the court: "There's a video that [defense counsel] and I need to look at maybe over a break and then discuss. I may try to introduce it. May not. May be some issues we may need to bring up with you." The court asked, "You want to do that over the lunch hour?" and then recessed for lunch. After the lunch recess, the prosecutor advised the court that he had reviewed the tape with appellant's trial counsel over the break and that they had agreed to a "slight redaction" that met "any objection [the defense counsel] may have to it." Appellant's trial counsel did not seek a continuance or recess. Officer Duncan then testified, identifying as State's Exhibit 1 the cassette that recorded the events of February 9, 2002, and Exhibit 2 as the redacted tape. The following testimony occurred:

[Prosecutor]: And have you reviewed that, the contents of [Exhibit 1]?

[Officer]: Yes, sir. I have.

[P]: Were they, in fact, an accurate copy of the events that happened at the time, both visually and audibly, around you?

[O]: Yes, sir.

[P]: That tape contains not just the events of this incident, correct; there's some stuff in the beginning, basically, from the beginning of your shift on?

[O]: That's correct.

[P]: And those were just other times you had made contact pulling people over or making contact with citizens, et cetera?

[O]: Yes, sir.

13

[P]:    It's not necessarily relevant to what's going on today; that's just surplus information?

[O]:    Yes, sir.

[P]:    On the back end of the tape, is there extra or surplus information as well?

[O]:    There could be.

[P]:    And it's typical for y'all to use tape like that to basically capture an entire day's worth of events that go on?

[O]:    Actually, it could be a number of days.

. . . .

[P]:    There's been no evidence that's been tampered with or messed with in any way?

[O]:    No.

[P]:    And it's an accurate recording?

[O]:    Yes, sir.

[P]:    Regarding State's Exhibit No. 2, that's another video cassette that I've handed you, and it's labeled, is it not, that it's a copy or partial copy of what's on State's Exhibit No. 1. Is that correct?

[O]:    Yes, sir.

[P]:    Did you know that State's Exhibit No. 2 is basically just the events of this incident, without—removing all the surplusage from the beginning and end of the red tape, State's Exhibit No. 1?

[O]:    Okay. I'll take your word for it.

[P]:    Okay. To the best of your knowledge, that's an accurate copy?

[O]:    To the best of my knowledge.

14

The redacted audiotape, State's Exhibit 2, was then admitted into evidence and published to the jury; however, the complete version of the audiotape, State's Exhibit 1, was not admitted into evidence. On cross examination, appellant's trial counsel confirmed that the officer was "not at the scene until after the physical confrontation had ended," that he had not observed "what happened between her and the police" earlier, and that no one had explained to him "what had happened with the physical altercation at all." Counsel then asked: "And what we don't see on the video tape that you did is to ask her to put some clothes on and assist her to get dressed. Is that correct?" The officer agreed that counsel's characterization of the redacted portion of the tape was correct. The portion of the tape played for the jury lasted approximately twenty-six minutes.

Appellant testified on her own behalf. On direct examination, appellant testified at length to the disagreement with her husband that escalated into a physical altercation, her concern that she did not need an ambulance and her fear that he might be arrested, the arrival of the police, her admonition to her husband that he not incriminate himself to the police, and her encounter with the officers as her husband was escorted from the bedroom. Appellant testified that she thought that if she "just kept [her] mouth shut," the police would not arrest her husband. On cross examination, she recounted the chronology of the encounter and testified, "I remember exactly what happened to me." The prosecutor then commented to her that she had testified with exactitude and had failed to testify at any point that she was unable to recall any aspects of the encounter. The following testimony occurred:

> [Prosecutor]: Let me ask you one more time. You haven't answered in response to any of [defense counsel]'s questions 'I don't recall,' 'I don't remember,' 'It's been a long time.' You haven't made any of those answers.

15

[Appellant]: No, because I still know exactly what happened to me.

The prosecutor then began questioning appellant concerning the statements made by appellant as well as her tone and other aspects of the audiotape: "Let's talk about—a little bit about the video. How many voices do you hear screaming on the video?" and "Would it be fair to say you were upset or angry at the time that you were screaming in the video?" The following testimony occurred:

[Prosecutor]: And then at some point, for whatever reason, you get angry enough to start yelling. Right?

[Appellant]: No. I still was not yelling.

[P]: I'm saying at some point in that time we hear you on the tape yelling.

[A]: I didn't start yelling until the tape, and that was after the incident had happened, and I was crying and I was mad at that time.

In closing argument, the prosecutor told the jury that "what this all boils down to" was that the appellant was "claiming self-defense." He urged the jury to "listen to the videotape. You don't hear any of the officers screaming. . . . Compare that demeanor and think about that demeanor." In his final closing argument, the prosecutor focused on the audiotape:

A pretty good slice of evidence that gives you a nice snapshot, not necessarily what happened at those critical moments but later, and peering into people's demeanor, State's Exhibit No. 2, the video tape of Officer Duncan. Thank goodness he had his microphone on and we got to hear some of what was going on. Again, who's yelling on this tape? Who's not? Who's professional? Who's not? Who's calm? Who's not? And what does that show us?

. . . .

16

You also hear some pretty angry words on there, on that tape, that sort of don't jibe with the testimony of Brenda Johnson in some of these pictures. She is showing how she is doing these release moves, getting away from the officers. Any force she's doing is to push them away, to break away. But here on the tape, saying, quote—I remember her saying this—I recall her saying this—listen for yourself—quote, 'I hit them. I would hit them again. That's when I began hitting them.' Not 'escaping from them,' not 'forcing them off of me,' 'pushing them away.' Hitting them.

Defense counsel also relied on the tape, arguing that appellant stated repeatedly on the tape that she only responded to the police officers' use of force: "'I'll hit you again if you jump on me first.' That's what she says over and over again on the video tape." He argued that appellant was the real victim in the case, that she was just trying to keep the dispute "in the family," and was worried that her husband would be arrested.

3.  *Motion for new trial*

Appellant moved for a new trial asserting ineffective assistance of counsel on grounds that the audiotape was made without appellant's knowledge, her attorney failed to discover and obtain the tape prior to trial, and a redacted portion of the tape omitting material statements was played at trial.

Appellant testified at the hearing on the motion for new trial. Appellant stated that she was unaware that an audiotape recording had been made, that she was unaware of its existence until the middle of trial, and that, when she learned of the audiotape's existence, she told her defense counsel that she wanted to hear it:

[H]e said, 'Well, go ahead and go and take your lunch and come back and then we'll discuss it further.' Well, the next thing I know, they were already—Your Honor was coming in and they said, you know, 'Stand up,' you know. And he says 'I have

17

allowed them to go ahead and introduce the tape.' So he did it without my permission, and—because I wanted to see it.

It is undisputed that appellant saw the tape for the first time when it was admitted during Duncan's testimony. When the audiotape was produced to appellant, it was produced without a transcript of the recorded conversation. Appellant heard the audiotape for the first time when it was played in court. Appellant also testified at the hearing that she realized that the audiotape was incomplete when it was played.

At the hearing on the motion for new trial, appellant's trial counsel testified that he made the strategic decision to let the audiotape come into evidence even though it was produced to him for the first time during trial. Counsel testified that he learned of the existence of the audiotape in the middle of the trial and that he first saw the tape during the lunch-hour recess. Counsel recalled that he had adopted discovery motions and a *Brady* motion filed by prior counsel, but he did not think that he had "asked the Judge to rule specifically on the discovery motion." Counsel testified that he thought there were "portions" of the audiotape that could be considered exculpatory because they told "exactly the same story . . . that we tried to establish for the jury." Counsel summarized the defense theory as showing that the officers were unreasonable, that they should have behaved differently, and that they jumped on appellant. He concluded that, "I imagine that could be construed as being exculpatory," and "I was glad that the tape was played for the jury."

The prosecutor attempted on cross examination to elicit a strategy for the redacted testimony; however, trial counsel could not recall what was redacted or even the reason for the redaction. Counsel thought that the redacted portion might have been a verbal confrontation between

appellant and the police officers because "I don't want to introduce anything that might make Brenda appear to be unreasonable at the time." Counsel speculated that the redacted portion might contain statements made after appellant invoked her rights, but he could not recall precisely.

At the conclusion of the hearing, the State argued that appellant had failed to show any deficiency by trial counsel, or, if deficiency had been shown, that there was no prejudice to appellant. Appellant's counsel responded that deficiency and prejudice had been shown:

> [T]he fact that [trial counsel] had failed to discover or object to the introduction of the audio tape that was taken at the scene shows a dereliction of his duty as an attorney to properly investigate, interview witnesses and do discovery and, based upon that, that directly affects his ability to defend Ms. McDonald's rights at trial and, therefore, we believe that we've met the *Strickland* standard. . . .

The court then denied the motion for new trial.

### B. *Analysis*

#### 1. *Deficient performance*

A defendant has a broad right to recordings of her own statements. Article 39.14 of the Texas Code of Criminal Procedure provides for discovery upon motion and court order of, *inter alia*, "designated documents, papers, written statement of the defendant . . . objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State . . . ." Tex. Code Crim. Proc. Ann. art. 39.14(a) (West 2005). Article 39.14 can provide a basis for disclosure during trial as well. *Id.* Written statements of the defendant are discoverable pursuant to article 39.14. A tape recording of incriminating admissions by the defendant that the State will offer at trial is also within the statute.

19

*Quinones v. State*, 592 S.W.2d 933, 939 (Tex. Crim. App. 1980); George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 22.102 (2d ed. 2001); s*ee also United States v. Lanoue*, 71 F.3d 966, 974 (1st Cir.1995) (interpreting Federal Rule of Criminal Procedure 16 as granting defendant virtually absolute right to his own recorded statements).[3]

It is clear beyond peradventure that appellant's tape-recorded statements are subject to discovery if they are relevant and requested. The State does not dispute that the statements are relevant and that appellant is entitled to the audiotape recording. But a discovery request alone, without an order or follow-up in some manner, is a hollow gesture. Regardless of whether the taped statements were exculpatory or inculpatory, they were discoverable. It is undisputed that the audiotape was sought in discovery, that no order was obtained, and that it was not produced until mid-trial. When the audiotape was produced, it was produced without an accompanying transcript, making any redaction process over a luncheon recess difficult and virtually meaningless.

The State argues that trial counsel properly agreed to the admission of the audiotape because the statements on the tape were consistent with appellant's trial testimony and that the recording "was helpful to appellant's case because appellant appeared on the recording to be emotionally upset but not abusive, thereby making her appear to be a reasonably-minded person who was upset over being mistreated by the officers." The taped statement was forty-two minutes long and was made by Officer Duncan. Because Officer Duncan arrived after the altercation had

---

[3] Not only are a defendant's recorded statements discoverable, defense counsel has a duty to seek such evidence in possession of the State. In a recent ineffective-assistance-of-counsel case, the United States Supreme Court emphasized this investigative duty to obtain and review relevant material. *Cf. Rompilla v. Beard*, 2005 U.S. LEXIS 4846, at *8 (2005).

occurred, the tape does not contain a record of the actual events that transpired. The tape captures, however, appellant's explanations for her conduct and includes answers given by appellant in response to questions posed by Duncan. At one point, Duncan asked appellant whether there was "pushing and shoving"or "a struggle" with the officers, to which appellant acknowledged that there was. Throughout the tape, appellant was variously crying, upset, excited, and, as described by the prosecutor in his closing argument, "angry" and "yelling." She told Duncan that she would hit them again if they jumped on her. No *Miranda* warnings were given. At some unspecified point, appellant was handcuffed and placed under arrest.

The taped conversation thus contained direct admissions on the central issue of the case. Indeed, it is difficult to imagine evidence more important to the case than for the jury to hear in appellant's own voice her contemporaneous admissions that she had struck the officers and would do so again.

The portion of the audiotape played for the jury contained remarks by persons who were not present during the incident and, unlike appellant, do not sound emotional. For example, appellant can be heard arguing with her pastor as he defended the actions of the police and tried to talk her "down," explaining to her that "[w]e can't take the law into our own hands," and "[t]wo wrongs do not make a right." In several instances, Duncan, who knew appellant and sought to calm her, made self-serving statements that could hardly be construed to be helpful to the defense: "You're blocking our investigation"; "[y]ou're not being reasonable"; "I thought you were an intelligent woman"; "[y]ou're upset; you got out of control." Duncan advised the EMS personnel who had arrived on the scene: "She's highly agitated."

21

And importantly, contrary to testimony by the State's witnesses, the redacted tape in evidence did not contain the entire dialogue between the officers and appellant. "Surplusage" alone was not redacted. Rather, twenty-six minutes of the tape were played for the jury. The last sixteen minutes were redacted and not played at trial.

The unplayed minutes are the only portion of the tape that could be construed to be exculpatory. As described by trial counsel at the motion for new trial, the defense theory was that appellant acted reasonably and that she was "attacked unreasonably" by the police. In the redacted portion of the tape, appellant repeatedly insisted that the officers never asked her to get up out of the bed and that their over-reactive response was not provoked by her conduct. At one point, appellant engaged one of the officers in conversation, demanding "Did y'all ever ask me to get out of the bed?" A brief argument between the two ensued. Appellant insisted that she even "said please leave" and "never once" did the officers ask her to get out of the bed before they jumped on her: "I was just laying in the bed." But the jury did not hear this portion of the tape. Importantly, this was the only portion of the tape that contained statements by one of the officers actually involved in the incident so that the jury could truly compare the tone of the police officers with that of the appellant as the prosecutor urged them to do.

Trial counsel's deficiency in failing to discover a key piece of evidence strikes at the heart of the effective assistance of counsel. Seeking and obtaining inculpatory—or exculpatory—statements in the defendant's own voice is an essential part of case investigation, preparation for trial, and trial strategy. A request by the defense for the defendant's own "statements" is a fundamental aspect of discovery. This discovery enables defense counsel to

prepare adequately for the prosecution's efforts to incriminate the defendant through the defendant's own words, which, as here, are often a damning form of evidence. This discovery also permits defense counsel to make informed judgments regarding the strength of the prosecution's case. The decision to call witnesses—and particularly whether to call the defendant herself—must be informed by all the evidence to be presented, especially by such compelling evidence as a recorded statement. In such light, a lengthy recorded statement of the appellant's own voice appears fundamental to trial preparation and strategy.

Trial counsel's failure to discover the existence of the tape prior to trial clearly had ripple effects throughout the trial. A defendant is entitled to plan trial strategy based upon full disclosure. It cannot be effective trial strategy to forego trial strategy. If, prior to trial, appellant had listened to the audiotape, her overall strategy might have been substantially different. For example, she might have considered a plea. Or, the audiotape might have refreshed appellant's recollection as she prepared to testify. Indeed, the very decision whether to testify is a key part of trial strategy, which the delayed production adversely affected. The failure to obtain the audiotape before its use at trial subverted the purpose of discovery to facilitate the fair and efficient pre-trial determination of the statement's admissibility. Appellant's attorney might have considered filing a motion to suppress the audiotape—or negotiated with the prosecutor not to play the audiotape, as the prosecutor himself suggested to the judge prior to the lunch-recess production of the tape. The parties agree that at least part of the audiotape was inadmissible and therefore was not played for the jury. But appellant was hampered from further challenging the admissibility of the audiotape, or at least from negotiating for further redaction or exclusion. In any event, timely investigation and

production of the audiotape would have given trial counsel time to evaluate its content, play it and discuss it with appellant, and, assuming it was to be played, negotiate any appropriate redaction.

No defense lawyer, regardless of talent, can incorporate such a material item of evidence into a defense strategy, prepare for examination based on its admission, and negotiate a redaction of a forty-two-minute tape—without the benefit of a transcript—all over a lunch recess. Indeed, merely listening to the entire tape would require almost an entire lunch recess. It is clear from the record that trial counsel did not have a strategy for admitting the redacted audiotape. This is evident from his mistaken understanding of what the redacted portion contained. Notably, trial counsel was not even aware that appellant was not advised of her rights as the audiotape recorded the unfolding events. Moreover, trial counsel's failure to obtain the audiotape prior to trial was compounded by his failure upon discovery of its existence to move for a continuance or other delay in the trial.[4]

The production of the audiotape does not turn on whether the statement is exculpatory. If recorded statements are to be used in the prosecution's case-in-chief, presumably they are relevant and inculpatory, and must be disclosed to the defense before trial. But if they are not used by the prosecution because they are exculpatory, there is a constitutional basis for disclosure. In any event, the audiotape should have been sought—and produced—prior to trial.

---

[4] Some courts have concluded that a defendant seeking to complain on appeal of the denial of discovery must, to preserve that complaint for appellate consideration, move for a continuance or other delay in the trial. *See, e.g.*, *Murray v. State*, 24 S.W.3d 881, 893 (Tex. App.—Waco 2000, pet. ref'd); *McQueen v. State*, 984 S.W.2d 712, 718 (Tex. App.—Texarkana 1998, no pet.).

24

Counsel's failure to obtain the audiotape and his subsequent failure to move for continuance constitute deficient performance.

### 2. *Prejudice*

Having found counsel's performance fell below an objective standard of reasonableness, we must now decide whether there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance. *Strickland*, 466 U.S. at 686. The entire trial turned on whose version of events was credited: four police officers or appellant and her husband. The audiotape's critical importance to the trial is clear from the prosecutor's repeated challenges to appellant's credibility, his suggestion that she had changed her version of events, and his urging upon the jury to "compare" her trial testimony with the taped statement. Given the nature of the charges and the "totality of evidence at trial," the importance of the recording and its belated production, and the misleading impression left on the jury by both the prosecutor—without objection—and trial counsel that the audiotape was played in its entirety, we conclude that these errors undermine the concept of a fair trial and that there is a reasonable probability that the outcome would have been different. *See id*. at 695.

Because appellant's trial counsel was unaware of the existence of the recording throughout the proceedings, he was unable to prepare the jury for the admission of the tape and to incorporate this critical exhibit into his trial strategy. Appellant's own testimony was not informed with the benefit of the recording. Her testimony and credibility at trial were undermined by inconsistencies focused on by the prosecutor as well as the tone of the recording. The redaction of a substantial portion of the recording deprived the jury of evidence that corroborated appellant's

account of her interaction with the police. The recording was the lynchpin of a case that turned on appellant's credibility, whether she acted reasonably, and the conflicting versions of events.[5]

Unlike the recent cases of *Johnson* and *Goodspeed*, there is no legitimate trial strategy that justifies trial counsel's failure to obtain the critical evidence of the audiotape, failure to seek an order for its pre-trial production, and failure to seek a continuance upon the discovery's belated production. Furthermore, no legitimate trial strategy justifies trial counsel's manner of redacting the tape and his bolstering of the prosecution's suggestion that the complete tape was played. At the motion for new trial, neither the State nor trial counsel offered any explanation for the failure to obtain the tape prior to trial or for the statements at trial by both counsel suggesting that the entire tape—except for "surplusage"—was played for the jury.

The State nevertheless argues that trial counsel made a strategic choice to redact the tape so that the exculpatory portion was played and the inculpatory part was removed. At the motion for new trial, however, trial counsel was uncertain and could not recall his redaction strategy. Because we cannot fathom any "informed strategic choice," *Strickland*, 466 U.S. at 691, justifying these various actions flowing from the failure to seek admittedly relevant evidence, we believe that under these circumstances there is a reasonable probability that, but for counsel's deficient conduct, the result might have been different. As observed by the Court of Appeals for the Fifth Circuit, we are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to

---

[5] In a recent ineffective-assistance-of-counsel case where a defendant asserted that his defense counsel deprived him of his right to testify, the Texas Court of Criminal Appeals recognized the hazard of inconsistent and contradictory "stories" at trial. *Johnson v. State*, No. PD-1623-03, 2005 Tex. Crim. App. LEXIS 818, at *46-47 (Tex. Crim. App. May 25, 2005). Specifically, the court found that it was more hazardous to allow inconsistent testimony, and thereby invite prejudice, than it was to deprive the defendant of his right to testify. *Id*.

fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). In the absence of any possible legitimate trial strategy reasons for counsel's conduct, we are persuaded that appellant has shown that she was prejudiced substantially by the belated production and admission of the redacted tape and the representations made to the jury regarding the playing of the tape in its entirety. We believe that counsel's deficient representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

## CONCLUSION

Consequently, we find no valid strategic reason for trial counsel's performance, and he has provided none. Although the record supports trial counsel's articulation of the defense theory as a valid one, the redaction and the manner in which it was accomplished could not have constituted sound trial strategy. The failure of counsel to obtain an order for the discovery request, the belated production and failure to seek a continuance to properly evaluate the content and admissibility of the recording, the hasty and ill-conceived redaction of the recording over the luncheon recess, the questioning by the prosecutor to elicit incorrect testimony that the redacted tape was complete with no objection by trial counsel, the questioning by the trial counsel suggesting that the redacted tape was complete, and the critical nature of the evidence to the trial lead us to conclude that there is a reasonable probability that the result of the proceeding would have been different but for the errors made by counsel. Our confidence in the outcome of the trial has been undermined by these errors.

Accordingly, we hold that appellant did not receive the assistance of counsel required under the United States and Texas Constitutions. We sustain appellant's third point of error, reverse the conviction, and remand the case to the trial court for a new trial.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Reversed and Remanded

Filed: July 6, 2005

Publish