Opinion issued March 31, 2023



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-19-00878-CR**

**NO. 01-19-00879-CR**

_____

**KEVIN ANTONIO CABALLERO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1594160, 1594161**

---

# O P I N I O N

Kevin Antonio Caballero was convicted of two counts of aggravated assault with a deadly weapon and sentenced to 30 years' confinement.[1] The charges

---

[1] *See* TEX. PENAL CODE § 22.02.

stemmed from Caballero shooting two men during what was intended to be a fistfight in his friend's backyard.

In this direct appeal, Caballero raises a single issue—that he received ineffective assistance of his retained counsel during the guilt-innocence and punishment phases of his trial. The State points out that Caballero raised this same issue in a denied motion for new trial and requests that we treat Caballero's issue as a challenge to the denial of his new-trial motion, which would invoke a more deferential standard and require us to view the record in the light most favorable to the trial court's ruling.

We agree that the ineffective-assistance claim must be analyzed on appeal as a challenge to the denial of Caballero's motion for new trial in which he asserted the same claim. But we conclude that the trial court abused its discretion in denying the new-trial motion and, therefore, reverse and remand for a new trial.

**Background**

The events leading to Caballero's conviction happened in the backyard of a home owned by K. and E. Singleton.

K. Singleton had the idea that ongoing tensions between a young man living in her home, Ashton Smading, and another man, Matt Brown, needed to be resolved through a fistfight to avoid tensions erupting into a gunfight. Singleton arranged for Smading and Brown to fight in her backyard. Each brought friends as

"backups" to protect them from being "jumped" during the one-on-one fight. Smading brought Caballero. Brown brought three men: D. Byars, S. Bell, and Z.

All men, except Smading, went to the backyard. Smading stayed in the house and left Caballero alone in the backyard with Brown and his three friends. K. Singleton was also in the backyard. There is video evidence of what happened next in the fight because the Singletons' home surveillance videos were admitted as evidence and played for the jury.

The first four videos show events leading to the shooting. In the first video, Caballero is seen arriving alone to the Singleton/Smading home. In the next video, K. Singleton is seen removing a trash can and recycling bin from the backyard before the fistfight. In the third video, Brown and his three friends set their belongings on the ledge of the privacy fence and gather for the fight in the backyard. Brown is hopping up and down, punching the air. He engages in a brief, friendly spar with one of his friends as he waits. In the fourth video, Caballero walks to the far corner of the fenced yard and turns toward Brown and his friends with no yard space behind him. The key video is the fifth video.

In the fifth video, all men appear to be waiting for Smading. Caballero is seen squatting down, with his back to the far corner of the fenced yard. Brown and Bell are standing near Caballero. Byars, Brown's other friend, is standing on the other side of the privacy fence. And Singleton is standing at the entrance of the

backyard gate. Brown and his friends are standing near Caballero. The men are talking, but there is no audio on the recording to know what is being said or to whom. Brown and Bell appear to be talking, and Bell points his finger at Caballero and then walks away. Caballero stands, pauses, then walks toward a nearby gate in the privacy fence. Byars and Singleton are standing at the gate opening. Caballero backs away as he runs his hands through his hair. He then pushes forward to the gate again and moves past Singleton and Byars, who turns but remains at the gate. Brown, Bell, and Z move toward the gate. Caballero is in what appears to be a space between the privacy fences of neighboring homes. Caballero then moves out of view.

Brown and his three friends are at or around the gate, when, suddenly, they lurch, duck, and run. Byars is seen collapsing on the other side of the privacy fence. Caballero comes back into view. He is holding a gun, shooting toward the men in the backyard. Brown jumps over the backyard fence for cover. Caballero moves out of view again, just briefly. As he comes back into view, he is seen reaching into his shorts pocket, pulling out a black object, and bringing it up toward his gun. He moves out of view again. Bell also runs toward the backyard fence and jumps over.

All men are out of view at this point, except Byars. Byars is lying on the ground in the space between the privacy fences. His legs are visible, but his upper

body is obscured from view by a privacy fence. Caballero is not in view. Byars is motionless until, suddenly, his leg twitches high into the air.[2] After a moment, Byars stands and hurries out of view. There are blood stains on his t-shirt. The video ends with an empty backyard.

## A.    The State's theory of the case

The State established its theory of the case in opening statements. The prosecutor told the jury that Caballero brought "a gun to a fistfight" and "start[ed] shooting at everyone execution style." Caballero was trying "to kill" Brown and his friends "pointblank, unprovoked." The prosecutor characterized the two men who were shot—Byars and Bell—as merely "in the wrong place, the wrong time, not trying to hurt anybody." They were "there because their friend was supposed to be in a fistfight." The evidence would show, the prosecutor said, that no one approached or tried to beat up Caballero. More specifically, the prosecutor said that Brown and his friends "never threaten[ed]" Caballero. Throughout trial, the prosecutor framed the shooting as an unprovoked attempt to execute unarmed, harmless bystanders.

The trial proceeded with the State calling witnesses without an opening statement from the defense.

---

[2]    The jury was told that Byars's leg rose suddenly because he was shot in the back, "execution"-style.

**B.      The State's three witnesses**

The first witness was K. Singleton. She testified about the layout of her house and backyard. She authenticated the surveillance videos the police obtained from her home security system and testified that they accurately represented what happened that day. And she identified Caballero in the courtroom.

Singleton testified that there was supposed to be a fistfight in her backyard between Brown and Smading. She invited them to her house to fight so that they could resolve their disputes. She told them it would be a fistfight only, no weapons. Singleton "patted down" Brown and his friends to make sure they did not have weapons. She did not think to pat down Caballero, who arrived later.

She described Brown and his friends as being "hyped up" and "very mouthy." She told them there would be "no jumping" the other side. Asked what happened when Caballero went around the corner, she testified that he "pulled out a gun and started shooting." She added, "The guys were trying to jump him." At that point, she ran and hid in her garage. She described the sound of gunfire, stating that it "sounded like everybody was shooting." The prosecutor did not ask anything further about threatening conduct directed toward Caballero.

On cross-examination, Singleton said the men appeared to "have it out for" Caballero. Caballero's counsel asked her why she thought that. She said it was based on what they were saying to Caballero. The State objected to testimony

6

about what Brown and his friends said, asserting it was hearsay. The court sustained the objection. Caballero's counsel abandoned any effort to obtain testimony about threatening comments to Caballero. He did not make an offer of proof to memorialize the testimony he was not allowed to elicit.

Rather than pursuing testimony about any threatening comments that could lay the groundwork for a potential self-defense claim, counsel asked Singleton whether it appeared to her, having been an eyewitness to the events, that Caballero was in imminent danger. The State objected that the question called for speculation. The trial court sustained the objection. Again, counsel did not make an offer of proof to memorialize the testimony he was not allowed to elicit.

Throughout the cross-examination, the only question that pointed toward any defensive theory was a question confirming Singleton's testimony that she thought Brown and his friends were going to "jump" Caballero.

The next witness was S. Bell. He said he was sitting in a bar with friends when Brown got a text to meet at a neutral location to fight. They went to Singleton's backyard. He understood that it was supposed to be a one-on-one fight between Brown and someone else. Bell approached Caballero in the backyard to tell him to go get his friend for the fight. The "next thing" that happened was gunshots. Bell was shot in the arm. He hid behind an air conditioner. While Caballero reloaded, Bell ran. That is when he was shot in the back. Bell was

7

treated for a collapsed lung. His doctors did not remove the bullet from his back, fearing the surgery would cause more damage. Bell identified only Caballero as the shooter. He testified that Caballero was the only person who became violent.

The State's third witness was S. Byars, the other man shot that day. He testified that he was at a bar and asked Brown for a ride home. As they drove, Brown took a phone call and then told Byars that they were going to another location for Brown to fight someone. They went to the backyard, but the guy did not come out. Byars got a "bad feeling" about it.

According to Byars, he did not hear Caballero being threatened. He did not know Caballero, and he did not threaten Caballero. Byars testified that he saw Caballero turn to leave and then turn back with a gun. Caballero said nothing. He turned and shot. Byars was shot twice in the arm. He was shot again in the back while lying on the ground. The gunshot to his back exited at his armpit, coming within an inch of his heart. He had a metal plate placed in his arm, which reduced his mobility. He identified Caballero as the shooter.

## C. Caballero's opening statement

The defense's opening statement, where Caballero's defensive theory was to be presented to the jury, was only a single page of text in the trial transcript: 25 lines. Counsel told the jury the evidence would show that Caballero planned to tell Brown that Smading was not coming out, that things got "kind of crazy," that

Caballero was "walking out" but "folks begin to follow him," that Caballero determined he was "in mortal danger," and that Caballero used a weapon to defend himself because he was "in danger of his life."

**D.    Caballero's only witness: himself**

Caballero called no witnesses other than himself. He said he and Smading were friends. On the day of the shooting, after going to eat lunch, they returned to Singletons' house, where Smading lived. K. Singleton told Smading about the planned fight. Smading said he was not going to come outside to fight. Smading told Caballero to tell the others that he was not coming out.

Caballero testified that Smading handed him a gun. Caballero believed Brown and his three friends were "there for something else, not for a one-on-one." He did not want to leave K. Singleton alone in the backyard with the other men. He was concerned. He went to the corner of the backyard, with his back against the fence. The other men were "talking recklessly, acting very violently" toward him. He sat there for a minute or two. They were threatening him. He thought he was "about to get beat up real bad." He decided he needed to get out of there and tried to leave. But when he saw the men follow him, he pulled out the gun and shot. He did not think he could have fought them off. According to Caballero, he was "literally trying to fight for [his] life." The only description the jury heard, though,

about what may have been said to Caballero before the gunshots was that there had been "aggressive talk" by the other men.

During this testimony, Caballero's counsel repeatedly told him not to relay what anyone had said to him, apparently trying to avoid eliciting hearsay. He had Caballero vaguely confirm that the men said something to him, without specifying what the men said. Because counsel did not pursue Caballero's testimony about any threatening comments to the point of eliciting a hearsay objection, no moment arose for an offer of proof for the appellate record—assuming a sustained hearsay objection—first, what threatening comments were made, and, second, evidence to substantiate Caballero's testimony that his life was in danger. Caballero's defense abandoned all effort to establish any threatening conduct toward Caballero or to develop evidence of his state of mind as he drew the weapon.

On cross-examination, Caballero testified that he shot the men because they were following him and he feared for his life. He thought they would pursue him and "beat [him] to a pulp." He felt he needed to shoot them to defend himself.

Caballero admitted to shooting Byars but denied he was the person who shot the last bullet into Byars's back while he was on the ground. The prosecutor asked whether there were "some magic other bullets" that hit Byars in the back if it was not bullets from Caballero's gun. After some back and forth about whether Caballero ever reloaded his gun, Caballero testified that his gun was empty before

10

Byars was shot in the back. Caballero then said Smading fired the shot through the window that struck Byars in the back. The prosecutor responded, "Okay. Wow. That is amazing. First time we're hearing this." The State dismissed Caballero's identification of Smading as a shooter as fanciful.

After Caballero's testimony, both sides rested.

## E.    Closing arguments

In the State's closing argument, the prosecutor argued that Caballero was not legally justified in using deadly force unless he thought that Brown and Brown's friends were attempting to use deadly force against him. He argued there was no evidence of that. Instead, the evidence indicated that Caballero turned and shot men who were cornered in an enclosed backyard. He kept shooting even as they ran away.

In the defense's closing, Caballero's attorney reminded the jury that Singleton had testified—twice—that she thought Brown and his friends were going to "jump" Caballero. He argued that Caballero felt threatened.

The State's rebuttal focused on the gunshots after the men began to scatter. Some bullets went through the privacy fence where some of the men were on the other side running away. Another bullet went into Byars, who was on the ground, injured. The prosecutor argued that none of those shots could be justified as

11

self-defense. Caballero was shooting at fleeing men. He shot an injured man, who was already down, "execution"-style. Self-defense, he argued, did not apply.

The jury returned guilty verdicts on both aggravated assault charges. During the punishment phase, Caballero's sister and the mother of his young child both testified, seeking leniency.

Caballero's counsel also called Bell—one of the people Caballero was convicted of shooting. Counsel asked Bell about sentencing. Bell said that Caballero tried to take "years" from him and Byars and added, "So I mean, you want my truth, 60 years." Caballero's counsel replied, "All right. That's fair."

Counsel asked for Bell's agreement that Bell and the others' presence might have been "kind of intimidating" for Caballero. Bell testified that Caballero saw Singleton pat him and his friends down for weapons, knew they did not have weapons, knew he did have one, and still "made the choice to shoot [Bell] instead of, if he was in fear for his life, to run when he had an opening." Bell emphasized, "He made that choice, not me."

Caballero testified next. When asked about his statement that there was a second shooter, Caballero testified that it was something someone had told him happened. There were no follow-up questions about the possibility that Smading shot Byars in the back and possibly did some of the other shooting as well. Caballero asked for leniency, stating that he wanted to be a father to his son and to

12

help his sister. His counsel noted that Caballero was 27 years old and then asked Caballero for a number to tell the judge. Caballero responded, "Something I can do so I can be able to come out, 15 or so." Caballero planned to become a truck driver when he got out and to care for his child, his sister, and her child.

On cross-examination, the prosecutor asked Caballero about reloading his gun and shooting Byars in the back. Caballero denied he did so. Caballero's counsel followed up on redirect. Caballero testified that, after the shooting, Smading admitted to him that he shot bullets from an upstairs window of the house. The jury never heard testimony about any admission by Smading during the guilt-innocence phase of the trial.

Finally, during closing arguments, Caballero's counsel asked the court to sentence Caballero to the 15 years he requested, adding: "We were close to that prior to going to trial." Counsel noted that Caballero would be eligible for parole, at the earliest, at 7.5 years if sentenced to 15 years. In turn, the State emphasized that it was only luck that kept this from being a capital murder case, given that the bullet passed only one inch from Byars's heart. The State requested a sentence of 50 years.

The court sentenced Caballero to 30 years for each offense, to run concurrently, with credit for the 3.5 years he was in custody awaiting trial.

**F.     Caballero moves for a new trial, arguing ineffective assistance of counsel**

At the new-trial hearing, Caballero made several specific criticisms of his prior counsel's performance during all phases of his criminal trial. These criticisms are not distinct or isolated from each other. The interplay between the alleged deficiencies and how some created others necessarily affects our analysis. First, we list the alleged harmful omissions of defense counsel. Caballero maintained his counsel did not

- meet with him during the months and weeks leading up to trial;

- communicate a 15-year plea offer that was half the amount of his eventual sentence and equal to his requested sentence;

- meet with prospective witnesses who would have bolstered Caballero's self-defense claim;

- engage an investigator to learn the facts of the case even though the trial court had authorized the hiring of an investigator;

- understand the basic facts of the shootings for which Caballero was being tried;

- show the jury that the complainants whom the State described as simply being in the wrong place at the wrong time had weapons in their cars that they used in a gunfight with each other just minutes after Caballero drove away; or

- understand the law well enough to

  - (1) overcome a frivolous hearsay objection that kept crucial self-defense evidence from the jury,

  - (2) get critical self-defense-related instructions in the jury charge, or

14

- (3) know that Caballero did not need to testify for the jury to be instructed on self-defense.

Second, we list what Caballero says his counsel actively did that was prejudicial ineffective assistance. His counsel

- called Caballero to the stand without preparing him to testify, without understanding that threatening statements made to Caballero before he shot the complainants were admissible and could be recited in support of a self-defense claim, and without determining what facts Caballero might testify to; and

- called a complainant to the stand without having interviewed him, asked the complainant open-ended questions including what sentence the complainant wanted the court to impose, and when the complainant suggested a 60-year sentence, added to the already damaging effects of the testimony by responding, "That's fair."

Caballero submitted affidavits in support of his motion for new trial. The thrust of the evidence was that Caballero had a robust self-defense theory that the jury never heard because of his counsel's deficient representation.

The first affidavit is from K. Singleton. She was an eyewitness to the shooting. She was on the State's trial witness list. The State called her as a witness, and Caballero's trial counsel cross-examined her. In her affidavit, Singleton stated that no one from the defense team ever contacted her.

Although the trial court authorized Caballero's trial counsel to retain an investigator to investigate the facts of the offense, there are no bills in the record to indicate that the investigator investigated anything. But Singleton had key information relevant to Caballero's potential self-defense claim.

15

Singleton's post-trial affidavit stated that Smading had asked Caballero to be his backup in the fistfight. Once in her backyard, Brown and his three friends were "all pumped up and ready to fight." To her, Caballero looked scared. Caballero "was squatted down in the corner just waiting for [Smading] to come out." Brown and his friends became impatient and menaced Caballero. She continued,

> They were getting ready to attack [Caballero], I felt that. Next thing you know, I look over and these guys were trying to jump [Caballero]. [Smading] was nowhere to be found so [Caballero] was still alone up against these four guys. . . . [One of Brown's friends,] S[.] Bell, the same one who asked me to turn off the video, was calling [Caballero] all kinds of names. He was telling him he was "going to kick his teeth down his throat." [Caballero] was already squatted down so if he got a kick to the face that very well could have happened. [Bell] also said to me in front of [Caballero], "I just wanna let you know that we are gonna f– – Kevin up."

She said that, once the shooting started, she heard a lot of shots. At first, she thought Brown and his friends must have been shooting back, but then she found out it was Smading shooting from inside the house. She explained,

> I ran inside my house as soon as the shooting started. I heard a ton of shots so I thought that [Brown] and his friends must have snuck guns past me. I later found out that [Smading] was actually shooting at the backyard from a window inside the house.

Singleton confirmed that no one asked her about Smading as the second shooter when she testified at trial.

> At [Caballero's] trial, I testified for the [S]tate after a subpoena was sent to me. The only thing they allowed me to talk about was my address, the video, identifying [Caballero], who was in the backyard of my house, and my actions leading up to the fight. I would have said

16

much more if I hadn't been cut off. . . . [Caballero's] attorney didn't even know what to ask me because he had never talked to me before.

Finally, she confirmed her then-belief that Caballero was acting in self-defense.

> I believe [Caballero] was acting in self-defense. I could see that he was scared and I felt that same fear which is why I ran into my house. I don't think [Caballero] ever had any intention of hurting or shooting anyone. I would have told the jury all of this if I had had the opportunity and my testimony would have been favorable to [Caballero].

Singleton's affidavit aligned with a second affidavit provided by her husband, E. Singleton. He testified that Caballero's defense counsel never contacted him either. The prosecutor interviewed him and decided not to call him as a witness. If he had been called as a witness, he would have testified that he was inside the house with Smading when the shooting started.

> Once we heard shots start to go off outside, [Smading] and I were the only two people inside of the house. [Smading] was in my bedroom and I was in the hallway. I heard him fire off at least four (4) shots from my bedroom. I could tell they were different shots than the ones coming from outside because they were closer to me and much louder. [Smading] told my wife and I he had to leave before the police got there because he had residue on his hands.

Other evidence in the record indicates that the prosecutor knew—at the time of Caballero's trial—that Smading had given a recorded statement to police on the day of the shooting in which he admitted that he shot a gun from inside the Singletons' house into the backyard. Though the State knew this, it appears defense counsel never did. Thus, Smading's statement did not inform defense

counsel's choice of questions for Singleton during her cross-examination or for Caballero during his direct examination.

The third affidavit submitted in support of Caballero's new-trial motion was from a person who confirmed that she had listened to Smading's statement and that her attached transcription of it was correct to the best of her ability. In the recording, Smading tells an officer that he shot a weapon that day in self-defense. He was inside the house. There were "guys with guns" in his backyard. He was asked, "Did you have to shoot outside the house to—from inside the house out—to, to defend yourself or . . .? And Smading responded, "Yes, sir." Thus, the substance of Smading's statement to the police on the day of the shooting was consistent with what the Singletons said in their post-trial affidavits—that Smading fired shots from inside the house.

The fourth affidavit was from Caballero's trial counsel. Counsel conceded that he provided deficient representation and that the deficiencies harmed Caballero. He described his deficiencies by grouping them into six categories, but those six categories do not fully cover all the claims of deficiency raised at the new-trial hearing and on appeal. He admitted he was deficient in these ways:

(1)    not engaging in plea negotiations or conveying any plea deal to Caballero "until the week before trial began";

(2)    not asking for a jury charge instruction on multiple assailants in connection with a self-defense claim;

18

(3)     not offering evidence at trial that Brown and his friends had access to guns stored in their vehicles, that they had a gunfight with Smading in the Singletons' front yard immediately after Caballero left, or that Smading shot into the backyard at Brown and his friends through a bedroom window;

(4)     advising Caballero that he had to testify to get a self-defense instruction even though, unknown to counsel, that is not the law;

(5)     asking a complainant during the punishment phase of the trial how long Caballero's sentence should be, even though counsel had never interviewed the complainant and had no idea how the complainant might answer the question; and

(6)     filing an ineffective motion for new trial without contemporaneous representation of the client, without supporting evidence, and without setting the motion for hearing.

Counsel did not include in his affidavit any discussion of his pretrial investigation. Nor did he confirm what the Singletons said, which is that he never contacted them to learn what they were able and willing to testify to, if called.

Counsel concluded his affidavit by stating that he "was ineffective as [Caballero's] counsel at many points throughout [the] representation . . . and [he] take[s] responsibility for that." He agreed "that cumulatively [the] deficient performance was harmful to [Caballero] at both the guilt[-]innocence phase and punishment phase of trial." And he confirmed that he had no strategic reason for the lapses in his representation outlined in the six points above.

The State's presentation at the new-trial hearing had four parts. The first concerned plea negotiations. Caballero claimed in his affidavit that he was never told about a 15-year plea offer. The prosecutor testified at the new-trial hearing,

19

though, that he personally told Caballero of the 15-year offer a few days before trial began, he left Caballero and his trial counsel alone for a private conversation that he assumed was about the offer, and then counsel declined the offer. The trial court was within its discretion to believe the prosecutor's version of events.

The second part of the State's presentation concerned Caballero's role in the shooting. The prosecutor testified to his belief about what happened in the backyard the day Caballero shot Bell and Byars. His interpretation of the fifth video was that Caballero had an open route to leave the backyard and left briefly, the other men stayed "fairly stationary" (i.e., were not aggressively following Caballero), yet Caballero turned back and shot these men who were, in the prosecutor's words, "cornered, for lack of a better word" in the backyard. In his view, the video showed that Caballero reloaded his gun before moving offscreen to shoot Byars in the back "execution"-style as Byars laid helpless on the ground. The prosecutor stated his belief that Caballero was the only shooter in the backyard.

On cross-examination, the same prosecutor agreed that he had studied all available evidence in preparation for Caballero's trial. He admitted that he knew about the recorded police statement Smading gave on the day of the shooting:

DEPUTY TCHUDY:     [T]oday is June 4, 2018, it's 10:30 p.m., Deputy Tchudy with the Harris County Sheriff's Office, Violent Crimes Unit. What's your name?

ASHTON SMADING:     Ashton Smading.

20

DEPUTY TCHUDY: Alright Ashton. Uh . . . what'd you wanna have to say?

ASHTON SMADING: That I did shoot my weapon in self-defense. And they were on my property. And that's all.

DEPUTY TCHUDY: So you shot a - a weapon in self-defense earlier today. Where were you at when this happened?

ASHTON SMADING: Inside of my house.

DEPUTY TCHUDY: Inside the house when you shot? Okay. Um . . . did uh, you weren't outside the house when you were shooting?

ASHTON SMADING: No.

DEPUTY TCHUDY: In the driveway? Okay. Um . . . and that was the gun that was found beneath, underneath your seat in your driver's -

ASHTON SMADING: Yes, sir.

DEPUTY TCHUDY: On the driver's side of your car right? K. What type of gun is it, you know?

ASHTON SMADING: Taurus thirty-eight special.

DEPUTY TCHUDY: Thirty-eight special? Okay. So uh . . . you shot your gun in self-defense. Why did you feel in fear for your life or what - what were the circumstances surrounding that?

ASHTON SMADING: Some random guys with guns around my house. I mean -

DEPUTY TCHUDY: Okay. In the backyard or front yard?

ASHTON SMADING: In the backyard.

DEPUTY TCHUDY: Okay. And uh . . . so you were inside the house. Did you have to shoot outside the house to, from inside the house out to, to defend yourself or?

21

| | |
|---|---|
| ASHTON SMADING: | Yes, sir. |
| DEPUTY TCHUDY: | Okay. Um . . . anything else you wanna tell me in reference to that? |
| ASHTON SMADING: | No, sir. |
| DEPUTY TCHUDY: | Okay, um, I'm just confirming that you wanted to - to tell us about the guns to make sure that we understood why that the gun was shot and that it was shot and it was shot by you in self-defense. |
| ASHTON SMADING: | Yes, sir. |

At the new-trial hearing, the prosecutor would not acknowledge that Smading's statement meant that Smading had fired shots into the backyard from inside the house. But he did concede that Smading's statement—however this prosecutor was interpreting it—was inconsistent with his just-stated position and the State's trial theory that Caballero was the only shooter.

Still discussing Smading's pretrial statement, Caballero's new-trial-hearing counsel and the prosecutor had a lengthy discussion about one exchange before the jury during Caballero's criminal trial. The prosecutor had been cross-examining Caballero when he pressed Caballero about shooting Byars as he was lying on the ground. Caballero denied doing that, stating that Smading fired that shot. The prosecutor responded in front of the jury: "Okay, wow. That is amazing. First time we're hearing this."

Caballero's new-trial-hearing counsel characterized the prosecutor's response as a sidebar scoff at the idea of another shooter that made Caballero's

22

claim of self-defense seem laughable to the jury. He asked the prosecutor how Caballero's implication of Smading could have been "amazing" or surprising as he had explained given that the prosecutor knew of Smading's statement before the trial began. The prosecutor was already aware of Smading as a possible second shooter when Caballero testified about it at trial.

The prosecutor explained that he was in "shock" that Caballero implicated Smading so late in the trial. In the prosecutor's view, Caballero had many opportunities to develop the evidence of Smading being a shooter during the cross-examination of K. Singleton and during his own direct examination, yet Caballero never brought it up until this late point in his cross-examination. The prosecutor stated, "My shock was: Why did you bring it up just now when you've had all day to say otherwise?" In other words, he claimed he was reacting to the defense waiting until the eleventh hour to implicate Smading, not to the idea that Smading might have been a second shooter.

The third part of the State's presentation went to the veracity of the Singletons and defense counsel who submitted affidavits supporting the new-trial motion. The State posited that the Singletons now had a reason to blame Smading instead of Caballero: Smading died of an overdose and would face no consequences from shifting blame to him to help Caballero. And defense counsel was "falling on his sword" to help his former client.

The fourth part concerned trial counsel's representation and any harm it caused. According to the State, whether defense counsel was deficient is a "close call." But regardless, any deficiencies did not affect the criminal trial because there was overwhelming evidence of guilt—Caballero admitted shooting these men and there was video evidence of him doing it.

Defense counsel argued that there is a significant difference between a scenario where a man shoots repeatedly, unprovoked at "cornered," unarmed men, including a wounded man lying on the ground, versus a scenario where a man is about to be attacked by four men and shoots briefly in self-defense while another man is shooting additional gunshots through a window, including the shot that struck Byars while on the ground. The first scenario looks like an execution. That is what the jury heard and imposed a 30-year sentence. The second scenario sounds more like self-defense. But the jury never heard the second scenario.

The trial court denied the motion for new trial without issuing fact findings.

**Analysis**

Caballero contends he received ineffective assistance of counsel during both the guilt-innocence and punishment phases of his criminal trial.

**A.      Proper framing of appellate issue to determine deference required**

Caballero does not frame his appellate issue as a challenge to the denial of his motion for new trial after a hearing. Instead, he directly appeals whether he

received ineffective assistance of counsel. Because Caballero raised his ineffective-assistance claim in a denied motion for new trial, however, we analyze the claim on appeal as a challenge to the trial court's ruling on that motion, and we review the ruling under an abuse-of-discretion standard. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded in part on other grounds by* TEX. R. APP. P. 21.8(b), *as recognized in State v. Herndon*, 215 S.W.3d 901, 905 n.5 (Tex. Crim. App. 2007); *Starz v. State*, 309 S.W.3d 110, 118 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *cf. Norris v. State*, No. 05-16-00397-CR, 2017 WL 1075613, at *3 (Tex. App.—Dallas Mar. 21, 2017, no pet.) (mem. op., not designated for publication). We will reverse the trial court's ruling only if the decision to deny the new-trial motion was arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018); *Starz*, 309 S.W.3d at 118.

Trial courts are in a better position to evaluate the credibility of witnesses and resolve conflicts in evidence than appellate courts, which must rely on a submitted record. *See Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). Accordingly, we defer to the trial court's decision to believe or disbelieve all or any part of a witness's testimony. *See id.* This same deference applies when the testimony is by affidavit. *See Manzi v. State*, 88 S.W.3d 240, 243–44 (Tex.

Crim. App. 2002). If there are two permissible views of the evidence, the trial court's choice between them cannot be held to be clearly erroneous. *Riley*, 378 S.W.3d at 457. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.* at 457–58; *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

When, as here, the trial court makes no findings of fact on the denial of a motion for new trial, we "impute implicit factual findings that support the trial judge's ultimate ruling." *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005). But there is a limitation on imputing factual findings: we will only impute implicit factual findings that "are both reasonable and supported in the record." *Id.*; *see Escobar v. State*, 227 S.W.3d 123, 127 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

## B.      Standard for ineffective assistance of counsel

The Sixth Amendment of the United States Constitution guarantees an accused's right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (right to counsel "does not provide a right to errorless counsel, but rather to objectively reasonable representation"). To prove a claim for ineffective assistance of counsel, an appellant must establish, by a preponderance of the evidence, that (1) his trial counsel's representation fell below an objective

standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez*, 343 S.W.3d at 142. In determining whether there was a reasonable probability of a different result but for the ineffective assistance, courts look for a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

When conducting a *Strickland* analysis of alleged ineffective assistance of counsel, we look to the totality of the representation to determine counsel's effectiveness. *Cf. Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006) (setting forth standard on direct appeal). The purpose of the *Strickland* two-pronged test is to assess whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *See Strickland*, 466 U.S. at 686.

The appellant bears the burden to establish both prongs, and his "failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see Lopez*, 343 S.W.3d at 142 ("Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective.").

**C. Deficient performance: failure to investigate and prepare a coherent defensive theory**

Caballero argues that he received ineffective assistance of counsel at trial when his trial counsel failed to, among other things, (1) do any meaningful preparation or investigation for trial, (2) interview witnesses, or (3) present evidence in support of a self-defense theory. We address these three arguments together because adequately investigating and preparing for trial includes, among other things, interviewing and presenting witnesses, including the defendant. *See Perez v. State*, 403 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 310 S.W.3d 890 (Tex. Crim. App. 2010).

A criminal defense attorney "must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance of counsel." *Ex parte Welborn*, 785 S.W.2d 391, 394 (Tex. Crim. App. 1990). Counsel has a duty to make reasonable investigations or to make a reasonable decision that a particular investigation was unnecessary. *Strickland*, 466 U.S. at 691. Counsel's failure to conduct an adequate investigation may constitute ineffective assistance. *See Wiggins v. Smith*, 539 U.S. 510, 521–52 (2003).

Part of the duty to investigate is counsel's responsibility to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d at 394. To demonstrate ineffective assistance of counsel based on an uncalled witness, an appellant must show two things: (1) the witness would have been available to

testify and (2) the witness's testimony would have been of some benefit to the defense. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007); *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004).

A decision by counsel to not conduct a particular investigation is directly assessed for reasonableness in all the circumstances, and appellate courts are required to provide a heavy measure of deference to counsel's judgments. *Strickland*, 466 U.S. at 691; *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986); *Donald v. State*, 543 S.W.3d 466, 477 (Tex. App.—Houston [14th Dist.] 2018, no pet.). An appellant cannot show ineffective assistance based on failure to investigate and adduce evidence without showing what the investigation would have revealed that reasonably could have changed the outcome. *See Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *see also Butler*, 716 S.W.2d at 55. To determine whether an appellant was prejudiced from a failure to investigate and present evidence, this Court must "compare the evidence presented by the State with the 'evidence the jury did *not* hear due to trial counsel's failure to investigate.'" *Perez v. State*, 310 S.W.3d 890, 896 (Tex. Crim. App. 2010) (quoting *Butler*, 716 S.W.2d at 56).

An appellate court will not reverse a conviction based on failure to investigate unless the consequence of that failure "is that the only viable defense available to the accused is not advanced." *Donald*, 543 S.W.3d at 477; *see*

*Muirhead v. State*, No. 02-20-00089-CR, 2021 WL 4472626, at *6 (Tex. App.—

Fort Worth Sept. 30, 2021, no pet.) (mem. op., not designated for publication);

*Bahr v. State*, 295 S.W.3d 701, 712 (Tex. App.—Amarillo 2009, pet. ref'd).

Case law is not fully developed on the issue of what constitutes an available

defense being "advanced" to preclude reversal or "not advanced" to compel

reversal for ineffectiveness. A defense is advanced when counsel vigorously

presents the defensive theory through lengthy cross-examination of witnesses. *See*

*Flores v. State*, No. 01-20-00213-CR, 2022 WL 961554, at *16–17 (Tex. App.—

Houston [1st Dist.] Mar. 31, 2022, pet. filed) (mem. op., not designated for

publication). On the other hand, it is not advanced when counsel fails to interview

any witnesses, fails to follow up on a lead from his client about a possible alibi

witness, records less than two hours of work in preparation for trial, and fails to put

on *any* evidence at trial. *See Perez*, 403 S.W.3d at 251. Here, counsel's defensive

actions fall in the middle.

Caballero's counsel presented a defense to the extent he told the jury that

Caballero claimed self-defense; elicited a single, vague statement from

K. Singleton during cross-examination that she thought the group of men was

going to "jump" Caballero; and elicited statements from Caballero on direct

examination that he did not think he could get away from the men who were acting

violently and that he felt that he was fighting for his life.

30

But counsel did not present to the jury a coherent explanation of *why* Caballero felt threatened enough to resort to lethal force. While the jury heard the word "self-defense," they never heard a sufficient explanation for Caballero's fear. That was, at least in part, due to counsel actively avoiding any questions to witnesses that might elicit direct quotes of any threatening statements made to Caballero in the backyard. On appeal, Caballero argues that counsel's tactic was an ill-conceived attempt to avoid a hearsay objection. He points to places in the trial transcript where counsel told witnesses that they could not repeat what someone else said, thus closing off all testimony about any threats Caballero received before he drew a gun.[3]

Not only did counsel fail to present any coherent explanation for any need for self-defense, but counsel also failed to adduce evidence of how Byars was shot while lying on the ground already injured. The State argued to the jury that the

---

[3]    Here though, hearsay would not apply. The statements would not be offered for the truth of the matter asserted but, rather, for how they made Caballero feel and to gain insight into Caballero's claim that he needed to defend himself. In other words, a statement by a declarant that he is going to "kick in [someone]'s teeth"— which K. Singleton claims in her post-trial affidavit Bell said to Caballero—would be offered for how it made Caballero feel and to explain Caballero's response, not for the truth of whether Bell would really kick Caballero's teeth in. *See* TEX. R. EVID. 801(d)(2); *McGowan v. State*, 188 S.W.3d 239, 243–44 (Tex. App.—Waco 2006, pet. ref'd) (complainant's statement "I know you don't want to go to war over $50" was not hearsay because it was offered for declarant's state of mind, not statement's truth). Alternatively, the statement could qualify as an exception to hearsay as a then-existing mental or emotional condition. *See* TEX. R. EVID. 803(3); *Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000) (en banc) (complainant's statement that she was afraid of appellant was indicative of her state of mind and fell within exception to rule against hearsay).

final bullet fired into Byars was shot by Caballero, who attempted to execute a defenseless, injured man long after everyone else had fled. To mount his own defense, Caballero spontaneously asserted on cross-examination that Smading fired that last gunshot at Byars. When Caballero made that isolated statement without context or supporting testimony, the prosecutor openly scoffed that Caballero's claim was "new" and derided it as "magic bullets." Defense counsel advanced nothing during guilt-innocence in support of the defensive theory that someone else shot Byars as he was lying on the ground. Caballero's counsel's post-trial affidavit states that he had no strategic reason for failing to present such evidence. That failure left the jury with no way to connect Caballero's isolated statement, which the State mocked, to other details of the shooting to develop an understanding of what happened and why.

Case law does not tell us whether counsel uttering the word "self-defense" in addition to one-off statements by the defendant about another shooter and by one State's witness about men possibly "jumping" the defendant qualify as having a defensive theory "advanced" so that a failure to investigate or interview witnesses is not deficient performance. The trial court necessarily determined that they do, because it denied Caballero's motion for new trial requesting relief on this basis. We, then, must determine whether the trial court abused its discretion in denying the new-trial motion.

The State argues that the standard of review for a denial of a new-trial motion involves a great deal of deference to the trial court. Applying that deference, it argues, we must conclude that the trial court found witnesses with testimony in support of the denial were credible and that witnesses with testimony opposing denial were not credible. The State further argues that defense counsel's failure to admit to inadequate investigation and inadequate interviews of potential witnesses and failure to explain why he failed to do these things require this Court to presume a strategic reason for his inaction. We do not agree that the applicable standard of review insulates counsel's performance to the degree the State asserts.

Caballero's counsel admitted in his post-trial affidavit that there were several points during Caballero's trial that he acted without any strategic reason and that his errors harmed Caballero. After pointing to specific errors, including in the plea negotiations, charge conference, presentation of evidence on guilt or innocence, presentation of evidence on punishment, and in the handling of post-judgment motions, counsel stated: "I believe I was ineffective as [Caballero's] counsel at many points throughout my representation . . . and I take responsibility for that. I acknowledge that cumulatively my deficient performance was harmful to [Caballero] at both the guilt[-]innocence phase and punishment phase of trial."

Counsel's affidavit did not specifically admit to a lack of investigation as one of his enumerated deficiencies. He did not admit to failing to visit Caballero in

the Harris County Jail for the 15 months he represented Caballero to understand Caballero's version of events and prepare him to testify. He did not admit to failing to interview the Singletons. He did not admit to failing to investigate whether Smading fired shots from the upstairs window or to not knowing that Smading gave a recorded statement to police on the day of the shooting admitting to shooting from the upstairs window. Counsel did not refute Caballero's contentions. While it is true that Caballero's counsel was silent on these aspects of alleged deficient performance, we do not agree that the *record* is silent as to whether counsel failed to investigate or act strategically.

First, the Harris County jail records confirm that Caballero's counsel never once visited him in custody to learn his version of events and develop leads to hand over to an investigator. *See* AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION 4-3.3(b) (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ ("Counsel should interview the client as many times as necessary for effective representation, which in all but the most simple and routine cases will mean more than once."). Had counsel done this, he would have learned about the possibility of Smading as a second shooter, the detailed facts of any self-defense claim, and the need for further investigation of these two items. Although counsel was mistaken that Caballero needed to testify to receive a self-defense instruction,

the need to prepare Caballero to testify would have prompted visits to the jail. Instead, based on counsel's misunderstanding of the hearsay rules, Caballero had to wait until the State cross-examined him to present his self-defense testimony, which landed without any support from other evidence.

Second, Caballero's counsel admitted in his affidavit that he had no strategic reason for failing to present evidence that Smading shot from the upstairs window. There is an order from the trial court in the appellate record authorizing defense counsel to hire an investigator to assist with case development, which could have included interviewing Smading before he died. Yet there is no record of an investigator submitting a bill for payment, which can only be reasonably understood to mean that no investigator interviewed witnesses to be eligible for payment. Though counsel did not explicitly admit that he failed to investigate the Smading matter, he admitted that he had no strategic reason for keeping that defensive evidence from the jury. *See Aldrich v. State*, 296 S.W.3d 225, 244–45 (Tex. App.—Fort Worth 2009, pet. ref'd) (failure to investigate based on misapprehension of law was not strategic and constituted deficient performance); *see also* AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE STANDARDS FOR THE DEFENSE FUNCTION 4-4.1(a), (c) (4th ed. 2017), https://www.americanbar.org/grou ps/criminal_justice/standards/DefenseFunctionFourthEdition/ ("Defense counsel has a duty to investigate in all cases, and to determine whether there is a sufficient

factual basis for criminal charges. . . . Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter . . . [including] potential avenues of impeachment of prosecution witnesses[] and other possible suspects and alternative theories that the evidence may raise.").

Third, K. Singleton said in her post-trial affidavit that no one from the defense interviewed her before the trial. E. Singleton said the same. Even if counsel did not specifically admit that he failed to engage an investigator to interview the Singletons and visit the scene of the shooting, the lack of an invoice for an investigator supports the Singletons' statements. Had counsel been aware of a possible second shooter and the alleged threats Caballero received before he fired his weapon and how to navigate the hearsay rules, the jury could have been presented with a potentially colorable self-defense claim and heard evidence that contradicted the State's depiction of Caballero as an executioner. *See Frangias v. State*, 450 S.W.3d 125, 138–44 (Tex. Crim. App. 2013) (failure to secure deposition or request continuance to bring late-discovered witness to trial to advance sole defense was ineffective assistance of counsel); *Ex parte Amezquita*, 223 S.W.3d 363, 368 (Tex. Crim. App. 2006) (failure to investigate cell phone records pointing to another suspect was ineffective assistance of counsel).

This is not a silent record as to counsel's strategic choices. When all evidence in the new-trial record indicates that counsel failed to visit his client at the jail or interview witnesses and counsel admitted to ineffective assistance of counsel at "many points throughout my representation" in both the guilt-innocence and punishment phases of trial, including presenting a defensive theory that Smading shot at least some of the bullets that day, the normal presumption that accompanies a "silent record" should not apply. Indeed, counsel was given the opportunity to explain his trial strategy. *See State v. Frias*, 511 S.W.3d 797, 811 (Tex. App.—El Paso 2016, pet. ref'd).

We conclude the record demonstrates that Caballero's counsel was deficient in failing to investigate or interview witnesses to assist in presenting a coherent defense at trial. He neither conducted a reasonable investigation nor made a reasonable decision that made interviewing these eyewitnesses unnecessary. *See Wiggins*, 539 U.S. at 521–22. Because of counsel's failures, no cogent defense was advanced. The first prong of the ineffective-assistance test is met.

The State points out that the Singletons may have been lying in their post-trial affidavits. Smading died after Caballero's conviction. With Smading no longer facing the possibility of criminal punishment for the shooting, perhaps the Singletons decided to shift blame to Smading to help Caballero. But this theory ignores that the Singletons' affidavits are consistent with Smading's own version

37

of events that he gave to the police on the day of the shooting. Smading told the police that he shot from inside the house. E. Singleton's affidavit states that he heard Smading shoot from inside the house. Further, K. Singleton stated in her affidavit that there were so many shots fired, she thought more people were firing weapons than just Caballero.

Even if the trial court doubted the Singletons and determined that counsel's silence left open the possibility that there was a strategic basis for his decisions, that deficient performance will be excused only if we can conceive of a reasonable trial strategy that counsel could have been pursuing with the challenged tactics. *See Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005). When a reviewing court cannot conceive of any reasonable trial strategy that would support the actions or inactions of counsel, then counsel's performance is deficient. *See id.* It is not enough that this trial court might have viewed the affidavit from Caballero's trial counsel with skepticism. There still must be a conceivable and reasonable trial strategy that could have informed counsel's trial tactics.

Here, where an investigation would have revealed possible defensive evidence that there was an additional shooter and specific, articulable testimony about alleged threats to harm and "f– – up" the defendant just before his defensive maneuvers, the failure to undertake that investigation or interview those witnesses has no strategic basis. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices

made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Johnson v. State*, 172 S.W.3d 6, 20 (Tex. App.—Austin 2005, pet. ref'd) ("It cannot be effective trial strategy to forego trial strategy [through lack of investigation]."). Smading admitted in a recorded statement to police that he shot a weapon into the backyard from inside the Singletons' house. That evidence never reached the jury. Nor was the second shooter theory coherently presented to the jury, even without evidentiary support. If nothing more, the audio of Smading's statement would have corroborated key aspects of the Singletons' testimony to aid counsel in evaluating whether additional investigation into the Singletons' recollection was worthwhile, even if the audio did not, itself, make it into evidence.

Defense counsel's (1) lack of knowledge of the underlying facts of the case combined with (2) his acquiescence to inapplicable hearsay objections and (3) his poor preparation and management of his client's testimony and the cross-examination of the State's witness left Caballero without an articulated self-defense theory of his case. The jury was left with no intelligible explanation for the shooting other than the State's theory of "unarmed" victims, who were "not trying to hurt anybody" and did not threaten anyone, being gunned down

"execution"-style while simply being in "the wrong place" at "the wrong time." "[A] thorough factual investigation is the foundation upon which effective assistance of counsel is built[.]" *Ex parte Ybarra*, 629 S.W.2d 943, 946 (Tex. Crim. App. 1982) (citing *Powell v. Alabama*, 287 U.S. 45, 52 (1932)). Being uninformed to the point of inability to meaningfully advance the only viable defensive theory is simply not strategic. The trial court abused its discretion in determining otherwise.

## D. Prejudice

To demonstrate prejudice, the defendant must show that there is a reasonable probability that, but for his attorney's errors, the jury would have had a reasonable doubt about his guilt. *See Perez*, 310 S.W.3d at 893. In giving meaning to the Sixth Amendment's requirement that an accused receive effective assistance of counsel, "we must take its purpose—to ensure a fair trial—as the guide" in assessing prejudice. *Strickland*, 466 U.S. at 686. A fair trial has certain features that are missing here:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. . . . That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel

40

> because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Id*. at 685 (citations omitted).

A defendant must show more than "that the errors had some conceivable effect on the outcome of the proceeding," *Perez*, 310 S.W.3d at 894 (quoting *Strickland*, 466 U.S. at 693). "Rather, he must show that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id*. (quoting *Strickland*, 466 U.S. at 695). We must ask whether there is a "reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's errors, the outcome of the proceeding would be different." *Everage v. State*, 893 S.W.2d 219, 224 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd).

This is more than the simple evaluation of the sufficiency of the evidence. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Butler*, 716 S.W.2d at 54 (quoting *Strickland*, 466 U.S. at 686).

The prejudice standard is met on this record. Caballero had a viable defensive theory that, due to his counsel's deficient performance, was never advanced at trial. Unbeknownst to counsel, at least three witnesses were available

41

to testify that after Smading failed to emerge from the Singletons' house, Brown and his three friends "were trying to jump" Caballero and threatening they would "kick in his teeth" and "f– – him up." The jury could have heard that the men had weapons nearby and engaged in a shootout after leaving the Singletons' backyard. If advanced, Caballero could have presented evidence to support a theory of the case to refute the State's theory that Brown and his three friends were not innocent bystanders in the wrong place at the wrong time. This evidence would have countered the State's theory that no one threatened anyone that day except Caballero. The witnesses also could have told the jury that there was a second shooter. The State repeatedly portrayed the final shot at Byars as he was lying on the ground as an attempted execution of a wounded man unable to fight back. Evidence that someone other than Caballero shot that bullet at Byars would have considerably altered the narrative at trial.

Yet the jury heard none of this. Counsel failed to investigate and interview witnesses to gain a basic understanding of who was doing what where to present a coherent explanation of the alleged need for self-defense and the limits of Caballero's role in the shooting. *See Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) (failure to sufficiently investigate and prepare led to counsel not knowing whether one of his witnesses was truthful in negatively characterizing defendant and being unable to rebut aggravating evidence). This failure to meet with

42

Caballero, conduct a reasonable investigation, prepare witnesses to testify, understand the exceptions to the hearsay rule, and present the jury with a cogent self-defense theory permeated the entire trial. *See Holmes v. State*, 277 S.W.3d 424, 429 (Tex. App.—Beaumont 2009, no pet.) (omitting investigation and discovery of key evidence precluded trial strategy and preparation); *Johnson*, 172 S.W.3d at 19 (discussing ripple effects of failure to investigate). Counsel's conduct so undermined the proper functioning of the adversarial process that we cannot have confidence that Caballero's trial produced a just result. *See Butler*, 716 S.W.2d at 54.

We therefore conclude that the trial court abused its discretion in denying the motion for new trial based on ineffective assistance of counsel.

## Conclusion

We reverse and remand for a new trial.

Sarah Beth Landau
Justice

Panel consists of Justices Landau, Hightower, and Rivas-Molloy.

Publish. TEX. R. APP. P. 47.2(b).